Ronald TUSCANO, Appellant,

v.

Robert OSTERBERG and Olga Osterberg, Appellees.

No. 08–01–00001–CV.

Court of Appeals of Texas, El Paso.

April 11, 2002.

John R. Jones, Delgado, Acosta, Braden & Jones, P.C., El Paso, for Appellant.

William A. Elias, El Paso, for Appellees.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

Texas residents Robert and Olga Osterberg sued New York resident Ronald Tuscano in Texas for various causes of action associated with the Osterbergs' claimed ownership interest in a New York corporation. The trial court denied Ronald Tuscano's special appearance, from which he brings this interlocutory appeal. Finding no evidence that Texas courts possessed personal jurisdiction over Tuscano in this litigation, we reverse and render.

### Facts

In 1977, Ronald Tuscano and Robert Osterberg met in New York to discuss the possibility of doing business together. No written records exist of the partnership which they formed as a result of that meeting. Pursuant to this partnership, Tuscano and Osterberg created a series of Texas corporations over the years to conduct their used clothing enterprise.[1] In 1982, Tuscano formed Tierra Development Corporation, incorporated under the laws of New York and doing business in New York.

In September 1998, Robert and Olga Osterberg filed a declaratory judgment action against Tierra and Tuscano seeking the trial court's ruling that the Osterbergs owned 50 percent of Tierra's stock.[2] The Osterbergs also pleaded causes of action for breach of fiduciary duty, breach of the covenant of good faith and fair dealing, civil conspiracy, breach of contract, prom-

issory estoppel, fraud, conversion, and intentional infliction of emotional distress. Tuscano filed a special appearance alleging the trial court had no personal jurisdiction over him.

Immediately prior to hearing on the special appearance, the Osterbergs non-suited Tierra. The trial court denied the special appearance, retained jurisdiction over Tuscano, and filed Findings of Fact and Conclusions of Law in support of its decision. The trial court found Tuscano conducted substantial business activities in the State of Texas from 1982 through 2000, and had continuous and systematic contacts with Texas. Its ruling thus eliminated specific jurisdiction as a basis for personal jurisdiction over Tuscano.[3] The trial court based its long-arm analysis on TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2), that is that Tuscano was alleged to have committed a tort in Texas. Tuscano appeals in five interrelated points of error.

### Standards of Review

A defendant challenging a court's exercise of personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982); *Nikolai v. Strate*, 922 S.W.2d 229, 236 (Tex.App.-Fort Worth 1996, writ denied); *Hayes v. Wissel*, 882 S.W.2d 97, 99 (Tex.App.-Fort Worth 1994,

---

1. The record indicates there were six Texas corporations in which the Osterbergs and Tuscano were joint shareholders—HFTB, Goods–R–Us, B & O, Por Libra, York–Tex, and Calzado. Of these, only York–Tex was in existence at the time the lawsuit was filed, the others having been dissolved years before.

2. The Osterbergs' position on this point is inconsistent. Robert insists that he and Tuscano each owned a 50 percent share of

Tierra, while Olga testified that she was "partners" with Tuscano without detailing percentage shares.

3. That the trial court's failure to find specific jurisdiction was intentional is demonstrated by its rejection of all plaintiffs' proposed findings of fact and conclusions of law that referred to or related to specific jurisdiction.

no writ). Where, as here, a complete reporter's record is filed, the trial court's factual findings are not conclusive and an appellant may challenge the sufficiency of the evidence. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). Where such points are raised, the standard of review to be applied is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*[4]

■ In 1997, the Texas legislature expanded the jurisdiction of the appellate courts to permit the interlocutory appeal of a trial court's decision to deny a special appearance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (Vernon Supp. 2002). Since then, this Court along with other intermediate appellate courts, has adopted a factual sufficiency standard of review without discussing the reasons for doing so. *See MacMorran v. Wood,* 960 S.W.2d 891, 894–95 (Tex.App.-El Paso 1997, writ denied); *Nikolai,* 922 S.W.2d at 236; Hall, *Standards of Review in Texas,* 29 ST. MARY'S L.J. 351, 374–77 (1998). Only the San Antonio Court of Appeals has chosen differently, adopting an abuse of discretion analysis, reasoning that "[t]rial court decisions derived from both factual determinations and legal conclusions are generally reviewed for an abuse of discretion," and upon interlocutory review at least, this is the standard that should be applied. *Magnolia Gas. Co. v. Knight Equipment & Mfg. Corp.,* 994 S.W.2d 684, 689 (Tex.App.-San Antonio 1998, no pet.). For the reasons set out below, we now reject both factual sufficiency and abuse of discretion review, concluding instead that legal sufficiency is the best fit for reviewing the ruling on a special appearance on interlocutory appeal.

First, a factual sufficiency review normally results in a remand to the trial court for further proceedings. *See Elias v. Mr. Yamaha, Inc.,* 33 S.W.3d 54, 64 n. 6 (Tex. App.-El Paso 2000, no pet.). Nevertheless, although specifically engaging in such a review, this Court has reversed and rendered judgment finding a lack of personal jurisdiction, as have other courts. *In re Estate of Judd,* 8 S.W.3d 436, 444–45 (Tex. App.-El Paso 1999, no pet.); *Valsangiacomo v. American Juice Import, Inc.,* 35 S.W.3d 201, 210 (Tex.App.-Corpus Christi 2000, no pet.) (reversing and dismissing case for lack of personal jurisdiction). We know of only one other extremely limited situation where reversal based on factual sufficiency review results in a rendition or dismissal, rather than remand. *See In re Doe,* 19 S.W.3d 249, 253 (Tex.2000) (factual sufficiency is appropriate standard of review in parental notification appeals, and court of appeals' judgment rendered upon reversal). If we wish to maintain consistency of review sought with relief obtained, we believe factual sufficiency is not the proper method of analyzing special appearances.

■ A second problem inherent in using a factual sufficiency review for special appearance review is the question of Supreme Court jurisdiction. The Texas Constitution provides that the decisions of the courts of appeals "shall be conclusive on all questions of fact brought before them on appeal or error." TEX. CONST. art. V, § 6 (amended 1891). This provision restricts the jurisdiction of the Texas Supreme Court to questions of law. The absence or conclusiveness of evidence is a legal question within the ambit of the Supreme Court, but the weight and preponderance of evidence is a factual question within the

---

**4.** Liberally construed, Tuscano's evidentiary points of error assert there is no evidence to support the trial court's conclusions of law.

exclusive jurisdiction of the courts of appeals. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 73 (Tex.1997) (Hecht, J. concurring); *Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996). Thus, utilizing the factual sufficiency standard in special appearance appeals would effectively preclude our high court from giving guidance in this area of the law.

The abuse of discretion standard poses a different set of problems. We believe that the great deference afforded the trial court in abuse of discretion review cuts against the intent of the legislature in providing interlocutory appeal. Although special appearances are inherently fact-driven, they arise from an equally inherent legal question: whether the forum state has authority to adjudicate claims against a nonresident. Resolution of legal questions is a task peculiarly within the ambit of appellate courts. We believe that an abuse of discretion standard, at least as to the legal issues involved, is too deferential to the trial court's conclusions.

Legal sufficiency review, in contrast, strikes a balance between the fact-finding role of the trial court and the oversight role of the appellate court. Legal sufficiency review of special appearance rulings permits us to question the legal basis for the trial court's decision without reaching the drastic conclusion that the decision was arbitrary and without reference to guiding principles. It also avoids the inconsistency of finding factual insufficiency without the usual remand for further proceedings (which would be meaningless where we have found a lack of personal jurisdiction). Further, legal sufficiency review eliminates any argument that our Supreme Court is without authority to review an intermediate court's conclusions on the issue.

■ Finally, in legal sufficiency review, we must consider all the evidence in a light most favorable to the prevailing party, making every reasonable inference in favor of the trial court's ruling. *Associated Indemnity Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). That a legal sufficiency challenge requires a review of all record evidence is consistent with the scope of review used by this and other appellate courts in our earlier special appearance decisions. *Valsangiacomo,* 35 S.W.3d at 205; *Judd,* 8 S.W.3d at 440–41; *Nikolai,* 922 S.W.2d at 236; *Kawasaki Steel Corp.,* 699 S.W.2d at 203. We conclude this is yet another reason why it should be adopted as the correct standard of review.

We therefore adopt legal sufficiency review as the appropriate standard, and accordingly overrule our prior opinions, *Judd,* 8 S.W.3d at 441 and *MacMorran,* 960 S.W.2d at 894, to the extent that they conflict with this opinion.

■ Thus, if there is any evidence of probative force to support the special appearance ruling, we will affirm it. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). Stated another way, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *McLure v. Tiller,* 63 S.W.3d 72, 80 (Tex.App.-El Paso 2001, pet. filed). "More than a scintilla of evidence" exists when the evidence supporting the finding, as a whole, rises to the level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

■ Finally, if the evidence supports the implied findings of fact, we must uphold the trial court's judgment on any legal theory supported by the evidence. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Point Lookout West, Inc. v.*

*Whorton,* 742 S.W.2d 277, 278 (Tex.1987); *Runnells v. Firestone,* 746 S.W.2d 845, 848 (Tex.App.-Houston [14th Dist.]), *pet. denied per curiam,* 760 S.W.2d 240 (Tex. 1988). This is so regardless of whether the trial court articulates the correct legal reason for the judgment. *Harrington v. Railroad Comm'n,* 375 S.W.2d 892, 895 (Tex.1964); *Marifarms Oil & Gas, Inc. v. Westhoff,* 802 S.W.2d 123, 125 (Tex.App.-Fort Worth 1991, no writ).

### Personal Jurisdiction

▮▮▮▮ For a Texas court to exercise personal jurisdiction over a nonresident, two conditions must be met: the Texas long-arm statute must authorize jurisdiction and that exercise must be consistent with the due process guarantees provided in our federal and state constitutions. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990); *Nikolai,* 922 S.W.2d at 233; *see also* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19; TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). Under the Texas long-arm statute, personal jurisdiction extends to nonresident defendants that either continuously and systematically do business in Texas or are parties to litigation arising from or related to business they conducted in Texas. *O'Brien v. Lanpar Co.,* 399 S.W.2d 340, 342 (Tex.1966); *Nikolai,* 922 S.W.2d at 233. The Texas long-arm statute provides:

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
>
>> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]
>>
>> (2) commits a tort in whole or in part in this state.

TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997).

▮▮▮▮ The broad language of the Texas long-arm statute's "doing business" requirement reaches as far as due process considerations of the federal constitution allow. *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); *Nikolai,* 922 S.W.2d at 234. The plaintiff must meet two requirements to satisfy due process and justify the exercise of personal jurisdiction over a nonresident defendant. First, plaintiff must demonstrate that the nonresident defendant has purposefully established "minimum contacts" with Texas. *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 105, 107 S.Ct. 1026, 1028, 94 L.Ed.2d 92, 100 (1987); *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945); *Nikolai,* 922 S.W.2d at 234; *Guardian Royal Exch.,* 815 S.W.2d at 230. Second, plaintiff must show that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe,* 66 S.Ct. at 158; *Schlobohm,* 784 S.W.2d at 357; *Nikolai,* 922 S.W.2d at 234.

▮▮▮▮ The fundamental purpose of the minimum contacts analysis has been to protect the nonresident defendant from the unfair and unforeseen assertion of jurisdiction. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490, 498 (1980). This requires a determination of whether the nonresident defendant has purposely availed itself of the privilege of conducting activities within the forum state to invoke the benefits and protection of its laws. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 541–42 (1985). The "purposeful availment" requirement guarantees that a nonresident defendant will not be compelled to defend a suit in a jurisdiction based solely on random, fortuitous, or at-

tenuated contacts or the unilateral activity of another party or a third person. *Burger King,* 105 S.Ct. at 2183; *see also Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404, 412–13 (1984); *Nikolai,* 922 S.W.2d at 234.

 Nonresident defendants must have fair warning that particular activities may subject them to a foreign sovereign's jurisdiction. *Burger King,* 105 S.Ct. at 2181–82; *Nikolai,* 922 S.W.2d at 234. A nonresident defendant must therefore perform some overt act to subject himself to the possibility of being compelled to defend a suit in a foreign court. *MacMorran,* 960 S.W.2d at 895. This "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Burger King,* 105 S.Ct. at 2182.

 The exercise of personal jurisdiction is proper where the contacts proximately result from actions by the defendant that create a "substantial connection" with the forum state. *Burger King,* 105 S.Ct. at 2183–84; *see also Nikolai,* 922 S.W.2d at 234. The substantial connection between the forum state and the nonresident defendant must occur from the nonresident defendant's action or conduct purposefully directed toward the forum state. *Burger King,* 105 S.Ct. at 2183; *Nikolai,* 922 S.W.2d at 234; *Guardian Royal Exch.,* 815 S.W.2d at 230. A nonresident defendant's isolated contacts with the forum state or its residents are insufficient to permit the assertion of personal jurisdiction over that defendant. *Burger King,* 105 S.Ct. at 2184 n. 18; *Nikolai,* 922 S.W.2d at 234. To justify jurisdiction, minimum contacts must therefore be con-

tinuing contacts. *Nikolai,* 922 S.W.2d at 234.

### General Jurisdiction

 We divide the minimum contacts analysis into examinations of specific and general jurisdiction. In the present case, the trial court exercised its jurisdiction over Tuscano solely on the basis of general jurisdiction. General jurisdiction "occurs when a nonresident defendant's contacts are continuous and systematic, allowing the forum state to exercise jurisdiction over the defendant even if the cause of action did not arise out of the contacts with" that state. *Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 802 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (citing *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996)). For this reason, general jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts standard than that for specific jurisdiction. *Id.; Guardian Royal Exch.,* 815 S.W.2d at 228.

 We determine whether the assertion of personal jurisdiction comports with "fair play and substantial justice" by evaluating the contacts in light of other factors only if we find the nonresident defendant has purposefully established minimum contacts with the forum state. *Burger King,* 105 S.Ct. at 2184; *Nikolai,* 922 S.W.2d at 235.

 Here, much of the evidence relied upon by the trial court reveals that Tuscano's Texas contacts were made only in a corporate capacity. Generally, corporate agents and employees are not subject to personal jurisdiction in Texas merely because their employer does business in this state. *Siskind v. Villa Found. for*

*Educ.,* 642 S.W.2d 434, 438 (Tex.1982).[5] Sometimes referred to as "the fiduciary shield doctrine," this principle protects a corporate officer or employee from personal jurisdiction when all the individual's contacts in Texas were on behalf of an employer. *Garner,* 966 S.W.2d at 803 (no general jurisdiction as to Australian resident when his only contacts with Texas were on his employer's business). Nevertheless, a corporate employee is not shielded from personal jurisdiction as to intentional torts for which the employee may be held individually liable. *See, e.g., Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (reporter and editor of allegedly defamatory magazine article were subject to personal jurisdiction); *General Elec. v. Brown & Ross Int'l Distrib.,* 804 S.W.2d 527, 532 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (officers who personally arranged theft of design plans, ordered counterfeit and mislabeled parts, and made misrepresentations to customers were subject to personal jurisdiction in Texas).

■ The trial court concluded that the evidence established that Tuscano "has conducted substantial business activities in" and "had continuous and systemic contacts with" Texas, supporting a conclusion that general jurisdiction had been demonstrated. The majority of contacts supporting personal jurisdiction, however, took place before 1996, at the least three years before service of this suit was effected. We must therefore decide whether these contacts are too attenuated in time to be considered relevant to the "continuous and systemic" general jurisdiction analysis.

In 1993, Tuscano engaged in litigation concerning a corporate lease for York–Tex. However, this Court has held that the

voluntarily filing of a lawsuit in a jurisdiction is a purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit only when the lawsuits arise from the same general transaction. *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin,* 974 S.W.2d 918, 926 (Tex. App.-El Paso 1998, no pet.). In this case, it is undisputed that the 1993 litigation has nothing to do with the present suit.

In 1995, Tuscano signed a personal guarantee for rentals under a lease for York–Tex which ended in 2000. Tuscano never personally paid any of those rentals, merely guaranteeing he would have been responsible for those payments if the corporate entity defaulted. Under Texas law, this can serve as the basis for personal jurisdiction only if there is a showing that the guarantor offered his guarantee as an inducement to the plaintiff to enter into that contract. *J.D. Fields & Co., Inc. v. W.H. Streit, Inc.,* 21 S.W.3d 599, 604 (Tex. App.-Houston [1st Dist.] 2000, no pet.). The evidence in this case is to the contrary, that Tuscano did not offer his guarantee as a method of inducing Osterberg to contract with lessor. His role as a guarantor for a corporate lease does not qualify as a contact.

■ Third, Tuscano signed checks for York–Tex in his corporate capacity on a regular basis from 1994 to 1998. There is no allegation or evidence that Tuscano acted as an alter ego for York–Tex or that York–Tex was a sham corporation. To the contrary, the Osterbergs admit that Tuscano was within his authority to sign checks for York–Tex. There is no evidence that Tuscano ever signed a York–Tex check in

---

5. There is no evidence that Tierra ever "did business" within Texas. However, York–Tex and Por Libra were Texas corporations and

Tuscano did act on their behalf, sometimes while in Texas and sometimes while in New York.

an improper manner, or that he used the corporate entity for his own purposes. As a general rule, a court may not assert personal jurisdiction over an individual based on the individual's relation to a corporation unless the corporation is the individual's alter ego. *Royal Mortg. Corp. v. Montague*, 41 S.W.3d 721, 738 (Tex.App.-Fort Worth 2001, no pet.); *Al–Turki v. Taher*, 958 S.W.2d 258, 263 (Tex.App.-Eastland 1997, pet. denied); *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied). That Tuscano signed checks in New York for York–Tex in his corporate capacity is not an individual contact related to the gravamen of this suit concerning the ownership of Tierra. *See Royal Mortgage Corp.*, 41 S.W.3d at 738. As such, this contact is not sufficient to sustain the trial court's denial of the special exception. Fourth, York–Tex, via a corporate check signed by Tuscano, paid for insurance on a Texas vehicle which Tuscano used in New York. This evidence fails for the same reasons detailed above.

Finally, during the discovery phase of the 1993 Texas litigation, Tuscano testified that Osterberg was a shareholder and officer of Tierra. While this may relate to the merits of the Osterbergs' case, it serves no purpose as a "contact" except to show that the statement was made while Tuscano was in Texas. However, even if Tuscano's prior testimony could be construed as a contact, it is an isolated and attenuated event. Restated, this contact alone cannot be used to sustain the trial court's finding that Tuscano engaged in "continuous and systemic contacts" with Texas.

Tuscano also introduced the following evidence to negate jurisdiction. Tuscano has never lived in Texas. Tuscano has not physically been in Texas since 1996. It is undisputed that Tierra is a New York corporation that did business only in New York. Osterberg admitted that Tierra was never discussed and no written agreement was entered into between himself and Tuscano when Tierra was incorporated. In fact, Osterberg admits that there were never specific discussions concerning Tierra's creation because he assumed it would be like all the other corporations he had with Tuscano—that is, that Osterberg would supply the goods and Tuscano would supervise day-to-day operations. He also admits that there was "never was a contract, written or otherwise. . . . [Tuscano] and I were not ever involved in any contracts that I knew about."

Osterberg also admitted that stock certificates never issued for any of the corporations that he and Tuscano created. He did not believe that any offices for Tierra ever existed in Texas. He did not know where Tierra's employees, books, or records were located, nor did he ever ask to see the books, review the tax returns, or receive an accounting. Osterberg did not know if he ever received a dividend from Tierra, or if he ever signed any loan agreements, checks, signature cards, financing agreements, property leases, or guarantees for Tierra. Osterberg testified he never paid any attention at all to Tierra.

### Texas Long–Arm Jurisdiction

As we have discussed above, the Osterbergs admitted there was never any contract between themselves and Tuscano regarding any of the businesses they held in common. Therefore, we conclude there is only one possible remaining basis for jurisdiction under the Texas long-arm statute which Tuscano need negate, that is, whether he committed a tort in whole or in part in this state. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (Vernon 1997). Whether personal jurisdiction exists often involves a resolution of underlying factual disputes. *C–Loc Retention Sys., Inc. v.*

*Hendrix,* 993 S.W.2d 473, 476 (Tex.App.-Houston [14th Dist.] 1999, no pet.). We will therefore look next to the evidence relevant to the tort claims.

The Osterbergs allege three tort causes of action—fraud, intentional infliction of emotional distress, and conversion. We find there is no evidence that Tuscano ever committed these torts "in whole or in part" in Texas.

### Fraud

■ Osterberg testified that the basis for his fraud cause of action against Tuscano was that Tuscano lied to him about who owned Tierra, although he also admits he never asked Tuscano about that issue until 1998. Osterberg recollects that the first time Tuscano told him that Osterberg owned half of Tierra was in New York, not Texas.[6] Personal jurisdiction thus cannot lie against Tuscano on the basis of that allegedly fraudulent promise because no tortious act was committed in Texas. Osterberg's testimony also contradicts his pleadings because he claims Tuscano told Osterberg that he owned stock in Tierra *after* it was formed. Osterberg's fraud claim fails, therefore, because Tuscano's promise could not have been designed to induce Osterberg to invest in Tierra. In fact, Osterberg had no knowledge of how or why Tierra was formed, what his capital contribution to the corporation was, whether he had ever been paid by Tierra, how much stock he had in the corporation, or whether stock had ever issued.

Osterberg testified that Tuscano finally revealed the alleged fraud in April 1998. At that time, Osterberg phoned Tuscano in New York from Texas. Osterberg made the call because he was upset about the quality of goods he was receiving from Tierra. In the course of that conversation, Osterberg asked Tuscano, "Who the hell owns Tierra while we're on the subject?" Tuscano answered that Osterberg did not.

The contact that revealed Tuscano's alleged fraud thus originated with Osterberg, not Tuscano, and as such cannot be imputed to Tuscano. *See Judd,* 8 S.W.3d at 443 (unilateral action by plaintiff does not constitute voluntary submission to Texas jurisdiction). Moreover, as telephone calls *to* the forum state are generally insufficient to confer personal jurisdiction, a telephone call *from* the forum state, placed by the plaintiff, must necessarily have even less value for the purposes of establishing jurisdiction. *See Klenk v. Bustamante,* 993 S.W.2d 677, 682 (Tex. App.-San Antonio 1998, no pet.). We find no evidence that Tuscano committed fraud in Texas.

### Intentional Infliction of Emotional Distress

■ The elements of intentional infliction of emotional distress include proof that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex. 1993); *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). The Osterbergs' own testimony conclusively defeats their intentional infliction of emotional distress claim.

■ The only intentional act alleged by Osterberg is that Tuscano's "allegations that Plaintiffs did not have any stock or other ownership in Tierra in or about April 1998 was intentional and made in a reckless manner." However, as discussed above, those statements were made to Osterberg in a telephone conversation which

**6.** The Osterbergs' evidence directly contradicts their pleadings on this point.

Osterberg placed from Texas to Tuscano in New York. Osterberg's actions cannot be imputed to Tuscano for the purposes of Texas long-arm analysis. *Judd*, 8 S.W.3d at 443. Even if the telephone call could be considered an imputed contact, telephone calls and correspondence as activities directed at the forum state are generally insufficient to confer personal jurisdiction. *Greeno v. Killebrew*, 9 S.W.3d 284, 287 (Tex.App.-San Antonio 1999, no pet.) (citing *Klenk v. Bustamante*, 993 S.W.2d 677, 679 (Tex.App.-San Antonio 1998, no pet.)).

Intentional infliction of emotional distress also requires proof that the tortfeasor acted in an extreme and outrageous fashion, "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wyatt v. Kroger Co.*, 891 S.W.2d 749, 753 (Tex.App.-Fort Worth 1994, writ denied). There is no evidence in this record that Tuscano acted in an extreme and outrageous fashion with regard to the Osterbergs.

Finally, the plaintiffs must also prove they suffered extreme emotional distress as a result of the defendant's extreme and outrageous actions. *Id.* Osterberg testified only:

> When she's upset, Olga, I am upset. And she was very upset because she couldn't sell the used clothing to women she knew. And she is the number one in my life. Now, maybe I'll die. I'm 75 years old, but if I'm alive, watch out for me where she's concerned.

He testified that Tuscano's action "ruined" his wife because she was no longer able to sell clothes. Olga herself testified that all of her claims were based on the fact that "I didn't get the merchandise so I'd be able to sell.... All I know is about the merchandise. I don't know anything else." Thus, there is no evidence that Tuscano intentionally inflicted emotional distress on the Osterbergs, so the Texas long-arm statute cannot apply.

## Conversion

Conversion is defined as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 622 (Tex.1992) (quoting *Tripp Village Joint Venture v. MBank Lincoln Centre, N.A.*, 774 S.W.2d 746, 750 (Tex. App.-Dallas 1989, writ denied)). As with the fraud cause of action, the Osterbergs were unable to produce any evidence that Tuscano converted any materials possessed by Tierra in Texas. Indeed, Osterberg conceded that whatever the converted material was, it had been located in New York and he did not know what Tuscano or Tierra had done with it. For her part, Mrs. Osterberg claimed only to know that she did not receive merchandise and that was the basis for her conversion claim. Like Osterberg, she could not identify what merchandise she did not receive or when she did not receive it, just that she stopped getting merchandise from Tierra. The failure to identify what property was allegedly converted defeats the elements of a conversion cause of action.

The proper exercise of personal jurisdiction over a nonresident requires that two conditions be met: first, that such jurisdiction is authorized by the Texas long-arm statute; and second, such jurisdiction must be consistent with the due process guarantees provided in the federal and state constitutions. *See Schlobohm*, 784 S.W.2d at 356; *Nikolai*, 922 S.W.2d at 233. For all the reasons detailed above, the trial court's conclusion that long-arm jurisdiction exists on the basis of Tuscano's alleged tortious activity is without support in the record.

We sustain Tuscano's five interrelated points of error.

### Conclusion

The trial court's denial of Ronald Tuscano's special appearance is reversed, and we render judgment sustaining his special appearance.